FILED
2023 Jan-17  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

Pro Se General Complaint for a Civil Case (Rev.10/16)

# United States District Court
## for the
### NORTHERN DISTRICT OF ALABAMA

*Plaintiff*
*(Write your full name. No more than one plaintiff may be named in a pro se complaint)*

JuliE Tapia

v.

Tom Shufflebarger

Case No.: 2:23cv64-RDP
(to be filled in by the Clerk's Office)

JURY TRIAL ☐ Yes  ☐ No

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the names of all defendants cannot fit in the space above or on page 2, please write "see attached" in the space and attach an additional page with the full list of names)*

## COMPLAINT FOR A CIVIL CASE

**I.    The Parties to This Complaint**

**A.    The Plaintiff**

Name    JuliE tapia

Street Address    930 AVEnUE F

City and County    Birmingham  Jefferson

State and Zip Code    AlABAMA  35214

Telephone Number    (205) 777-4314

**B.    The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization or a corporation. If you are suing an individual in his/her official capacity, include the person's job or title. Attach additional pages if needed.

Pro Se General Complaint for a Civil Case (Rev.10/16)

Defendant No. 1
    Name

    Job or Title

    Street Address

    City and County

    State and Zip Code

TOM Shufflebarger (CEO)
1208 3rd AVENUE south ↓

Birmingham    Jefferson
ALABAMA    35233

Defendant No. 2
    Name

    Job or Title

    Street Address

    City and County

    State and Zip Code

Defendant No. 3
    Name

    Job or Title

    Street Address

    City and County

    State and Zip Code

Defendant No. 4
    Name

    Job or Title

    Street Address

    City and County

    State and Zip Code

Defendant No. 5

Name _____

Job or Title _____

Street Address _____

City and County _____

State and Zip Code _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only these types of cases can be heard in federal court: a dispute that involves a right in the United States Constitution or a federal law (as opposed to a state law or local ordinance); a dispute that involves the United States of America (or any of its agencies, officers or employees in their official capacities) as a party; and a dispute between citizens of different states with an amount in controversy that is more than $75,000.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Constitutional or Federal Question  ☐ USA Defendant  ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction is USA defendant

The Defendant(s)

Name of Agency _____

Address _____

### B.    If the Basis for Jurisdiction is a Constitutional or Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Illegal search and seizure 4th Amendment
Unlawful detention 4th Amendment
10 U.S. CODE S 897 - ART. 97.
- CFR - 2011 - title 25 - vol 1 - SEC 11 - 404

Pro Se General Complaint for a Civil Case (Rev.10/16)

## C.  If the Basis for Jurisdiction is Diversity of Citizenship

1.  The Plaintiff

The plaintiff, *(name)*_____, is a citizen of the
State of *(name)*_____.

2.  The Defendant(s)

a.  If the defendant is an individual

The defendant, *(name)*_____, is a citizen of the
State of *(name)*_____. Or is a citizen of
*(foreign nation)* _____.

b.  If the defendant is a corporation

The defendant, *(name)*_____, is incorporated under
the laws of the State of *(name)*_____, and has its
principal place of business in the State of *(name)*_____.

Or   is   incorporated   under   the   laws   of   *(foreign   nation)*
_____, and has its principal place of
business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional
page providing the same information for each additional defendant.)*

3.  The Amount in Controversy

The amount in controversy – the amount the plaintiff claims the defendant
owes or the amount that is at state – is more than $75,000, not counting
interest and costs of court, because: *(explain)*

For unlawful search e seizure - 85,000
For unlawful Detainment - 800,000
Pain and suffering 80,000

## III.  Statement of Claim

Pro Se General Complaint for a Civil Case (Rev.10/16)

Write a short and plain statement of the claim. Briefly state the facts showing that the plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.



my child was admitted to childrens hospital on 10/21/2020 while there they took my purse, keys, phone and locked them up and put 2 officers outside my door rufused to let me use the restroom for what seemed like hours. Refused to let me get my medication out my purse Refused me medical care. At no time did I give permission For a search and seizure.

**IV.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks for the court to order. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive (punishment) or exemplary (warning or deterrent) damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I now have (white Coat Syndrome) Bad nerves, anxiety. Scared of doctors and officers talking to doctors is difficult as well so for my child is Scared to be alone with an adult in a doctor Setting. All those are a trigger to Seizures. I was diagnosed with epilepsy and Stress can cause an episode. In result causes my head to hurt.

Pro Se General Complaint for a Civil Case (Rev.10/16)

## V.   Certification and Closing

Under Rule 11 of the Federal Rules of Civil Procedure, by signing below, I certify to the best of my knowledge, information, and belief that this complaint; (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in dismissal of my case.

First Name ___Julie___ Last Name ___Tapia___

Mailing Address ___920 AVENUE F___

City and State ___Birmingham Alabama___ Zip Code ___35214___

Telephone Number ___205 777-4314___

E-mail Address ___Julietapia1405@gmail.Com___

Signature of plaintiff ___Julia tapia___

Date signed ___01|03|2023___

## **OPTIONAL**

You may request to receive electronic notifications. You <u>may not</u> file documents or communicate with the court electronically. All documents must be submitted in <u>paper</u> and you must serve the defendants.

Type of personal computer and related software/equipment required:

- Personal computer running a standard platform such as Windows or Mac OSX
- Internet access (high speed is recommended)
- A Web browser (Microsoft Internet Explorer 7.0 or 6.0 or Mozilla Firefox 2 or 1.5)
- Adobe Acrobat Reader is needed for viewing e-filed documents
- PACER account – Information and registration at www.pacer.gov

- You will receive one "free" look of the document. Documents must be viewed within 14 days. You must only single-click on the hyperlink to view.

**Note: You must promptly notice the Clerk's Office, in writing, if there is a change in your designated e-mail address. Failure to update your email address does <u>not</u> excuse failures to appear or timely respond.**

E-mail type:

☐ HTML – Recommended for most e-mail clients

☑ Plain Text – Recommended for e-mail accounts unable to process HTML e-mail

Conditioned upon the sufficiency of your electronic equipment which the court will test and verify receipt, you will be allowed to receive electronic notifications.

By submitting this request , the undersigned consents to electronic service and waives the right to personal service and service by first class mail pursuant to Rule 5(b)(2) of the Federal Rules of Civil Procedure, except with regard to service of a summons and complaint.

When a filing is entered on the case docket, a party who is registered for electronic noticing will receive a Notice of Electronic Filing in his/her designated e-mail account. The Notice will allow one free look at the document, and any attached .pdf may be printed or saved.

IMPORTANT:

Messages sent to Yahoo or AOL accounts are frequently found in the spam folder until the court is added to your address book.

E-mail address designated for noticing:

Julietapia1405@gmail.com

Participant signature: Julie tapia

Date: 01/13/2023

EVIDENCE

Julie tapia
Plaintiff

VS

TOM Shufflebarger



# Searches of Hospital Patients, Their Rooms and Belongings

*By*
*Angela T. Burnette[1]*

As demonstrated by news events this year, hospitals are unfortunately not immune to the risks of weapons or contraband being brought onto hospital premises. In just one month this year (June 2012), the media reported three separate hospital incidents. First, in Texas, a former patient entered a hospital emergency department allegedly demanding pain killers. When his request was denied, he reportedly took several hospital staff members hostage at gunpoint. The police arrived at the hospital but negotiations with the gunman proved unsuccessful; he was shot and killed by police.[2] That same month, in New York, a surgeon allegedly brought a gun to the hospital where he worked and killed a hospital receptionist. The surgeon later reportedly committed suicide.[3] Also in June 2012, a British hospital patient was reportedly found with illegal drugs. Hospital staff suspected the patient was taking the drugs after observing him behave erratically. The patient was later charged with possession of illegal drugs.[4] As described by The Joint Commission in a Sentinel Event Alert, hospitals were once considered "safe havens" but "as criminal activity spills over from the streets onto the campuses and through the doors," hospitals face particular challenges in securing the building and grounds "[b]ecause hospitals are open to the public around the clock every day of the year."[5] These challenges are especially difficult in high-traffic areas which have high-stress levels, such as the emergency department.[6]

This article summarizes the analysis used by courts in assessing searches conducted of hospital patients, their rooms and their belongings–whether in the Emergency Department or elsewhere at a hospital. Most of the caselaw in this area involves criminal defendants challenging a search conducted while they were hospital patients. Many cases involve police or state hospital staff performing the searches and thus involve the Fourth Amendment right of protection from unreasonable search and seizure. Courts have also addressed private searches, e.g., searches conducted by members of a private hospital's staff rather than the police. Both types of cases offer valuable insight into the type and scope of permitted searches at hospitals.

### Background on Fourth Amendment

The Fourth Amendment "applies only to searches and seizures conducted by government officials and persons who act as agents or instruments of government."[7] If the police conduct the search or if the hospital is a state hospital, hospital patients typically claim the Fourth Amendment protected them from unreasonable search and seizure. In such cases, patients (now criminal defendants) claim a search warrant was required and that the items found during the search should be excluded from evidence.

Courts typically apply a two-pronged test to determine whether an individual's Fourth Amendment rights have been violated. First, the search or seizure must be conducted by or on behalf of the

---

[1] Angela T. Burnette is Counsel in Alston & Bird LLP's Healthcare Regulatory Practice Group in Atlanta, Georgia. She focuses her practice on handling healthcare regulatory, litigation and privacy issues for numerous types of health care providers, including hospitals, physicians, ambulatory surgery centers, and health plans. She also assists with risk management emergencies, medical staff matters, end of life issues, and state licensing board investigations. Angela can be reached at angie.burnette@alston.com. She gratefully acknowledges the research assistance of Julia Dempewolf who was a 2012 summer associate at Alston & Bird.

[2] Jackie Vega, *Gunman Killed in Hostage Standoff ID'd*, KXAN.com (June 18, 2012), *available at* http://www.kxan.com/dpp/news/texas/gunman-killed-in-hostage-standoff-idd.

[3] *Buffalo Police Search for Surgeon in Fatal Shooting at Hospital, May Be Armed*, FoxNews.com (June 14, 2012), *available at* http://www.foxnews.com/us/2012/06/13/buffalo-police-respond-to-reports-deadly-shooting-at-hospital.

[4] *Patient Had Illegal Drug in Hospital*, BOSTON STANDARD (June 24, 2012), *available at* http://www.bostonstandard.co.uk/news/crime/patient-had-illegal-drug-in-hospital-1-3983263.

[5] "Preventing Violence in the Health Care Setting," Sentinel Event Alert, Issue 45, June 3, 2010. http://www.jointcommission.org/assets/1/18/SEA_45.pdf.

[6] *Id.*

[7] *See Wilson v. State*, 99 S.W.3d 767, 769–70 (Tex. App. 2003).

government. Second, the court looks to whether the individual had an expectation of privacy. An expectation of privacy typically involves a two-part analysis: (1) whether the individual has a subjective expectation of privacy; and (2) whether society recognizes that expectation as being reasonable.[8] This analysis requires a balancing of the legitimate need for the search against the intrusion upon personal rights.[9] Courts assessing Fourth Amendment issues also look to whether search warrant exceptions, such as inventory, exigent circumstances or the plain view doctrine, would permit search and seizure without a warrant.

## General Analysis Used by Courts for Private Searches

The Fourth Amendment does not apply to searches conducted by private individuals. Therefore, searches conducted by staff and employees of a private hospital are considered private searches which do not implicate the Fourth Amendment.[10] In assessing such searches by hospital staff of a patient, his room or belongings, courts tend to focus on two basic issues: 1) whether the patient retained any expectation of privacy in the belongings or area searched; and 2) if such a privacy interest existed, whether it was diminished or subordinate to a legitimate interest. Courts also examine the purpose of the search, whether the search was reasonable under the circumstances and whether there were exigent circumstances. In assessing these questions, courts engage in a fact-intensive analysis on a case-by-case basis.

## The Patient's Expectation of Privacy

To show a sufficient expectation of privacy, a hospital patient typically must show: 1) he or she had an expectation of privacy in the invaded possession or area; and 2) such expectation was accepted by society as reasonable.[11] As noted by a Texas court, the receipt of "[e]mergency medical care, by its very nature, results in diminished privacy of the patient," and "[c]lothing, jewelry, billfolds, and bags are routinely removed for a myriad of purposes" such as medical, care, safety and efficiency.[12] Additionally, it would be "unreasonable to tie the hands of hospital staff who need to examine the personal effects of a patient in an emergency setting in order to determine if he or she possesses any information that might throw light on the care and treatment needed."[13]

Courts often uphold searches of patients in the emergency department based on a diminished expectation of privacy. For example, in Florida, a criminal defendant sought to have suppressed a bag of pills a nurse had found underneath the mattress of his bed in a curtained-off area of the hospital's emergency department.[14] The nurse had previously noticed the bag sticking out of the back of the patient's underwear, and when she re-entered the room, she observed the defendant sitting on his bed with his hands underneath the mattress. The court held that even if the defendant had somehow formed a subjective expectation of privacy, "it was simply unreasonable for him to have done so in a busy hospital emergency room where medical personnel were constantly walking in and out and where he could have expected to remain only a few hours at most."[15] Likewise, in Vermont, the driver in a single-car accident was taken to a hospital's emergency department for treatment.[16] The troopers followed the driver to the hospital and asked a nurse for permission to see the driver in the emergency department. Consistent with the hospital's policy on law enforcement, the nurse granted the trooper access. The trooper walked into the emergency department's trauma room where the driver was being treated, and the door was open. The trooper did not ask for permission to enter, and the driver did not refuse entry. The driver refused the trooper's request for a

---

[8] *California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986).

[9] *United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983).

[10] *See People v. Radcliff*, 305 Ill. App. 3d 493, 712 N.E.2d 424, 238 Ill. Dec. 702 (1999). *Compare Ferguson v. City of Charleston*, 532 U.S. 67, 76, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001) (staff members of state hospital were government actors subject to Fourth Amendment); *Wilson*, 99 S.W.3d 767 (staff members of governmental hospital operated by county hospital district were considered government actors for purposes of Fourth Amendment).

[11] *Wilson*, 99 S.W.3d 767.

[12] *Id.* at 770.

[13] *Id.*

[14] *Buchanan v. State*, 432 So. 2d 147 (Fla. Dist. Ct. App. 1983).

[15] *Id.* at 148.

[16] *State v. Rheaume*, 2005 VT 106, 179 Vt. 39, 889 A.2d 711.

blood sample but told the trooper he had been drinking and driving. The Vermont Supreme Court later affirmed the driver's conviction for driving while intoxicated and disagreed with the driver who contended the trooper's entry into the trauma room was an illegal search. The Supreme Court held the driver did not have a reasonable expectation of privacy because the emergency department was a public area through which hospital staff, patients, patients' families, police, and other emergency workers constantly move, adding that the driver was only there a brief period of time.[17] Other courts have also recognized a patient's lack of a reasonable expectation of privacy in hospital emergency departments.[18]

In Illinois, EMT workers and emergency department nurses cut clothing off of a patient who was seriously injured in a one-car accident. An EMT worker noticed drugs strapped to the patient's body. For the purpose of locating identification, another EMT worker unzipped a fanny pack that was around the patient's waist and found drugs. The items were then locked in a narcotics cabinet at the hospital. The patient claimed the search of her clothing and fanny pack at the hospital was unlawful. The court first recognized the need for hospitals and staff to search individuals and their belongings in an emergency in order to ascertain identification and the possible use of medications.[19] The court also held that once a private party conducted a search and turned over the found items to the police, there was no longer any

expectation of privacy in the items searched.[20] Similar to the fanny pack in the Illinois case, while patients might generally assume purses or backpacks would be private because they store personal items, such expectations of privacy remain diminished when patients are receiving emergency medical care at a hospital.[21]

Courts have also addressed a hospital patient's expectation of privacy when a patient is receiving non-emergency care. In New Jersey, a police officer searched a patient's room at a state psychiatric hospital without a search warrant, after the patient's roommate died due to a drug overdose. The patient had been involuntarily committed for psychiatric care, and he had been at the hospital for two weeks. The court held the patient had a legitimate expectation of privacy in the living area of his hospital room and suppressed from evidence drugs which had been found in the hem of the room's curtain.[22] The court focused on the length of the patient's hospital stay and that the room contained a bed, nightstand, and personal wardrobe, similar to a living area. The New Jersey court commented that a patient's privacy interest in a hospital room could be more akin to a person's home than to one's car or office and concluded the police officer should have obtained a search warrant. However, a Michigan court held a hospital room was a public place where a patient could be arrested without a warrant.[23] The Michigan court concluded that while patients in hospital rooms may have some expectation of privacy in their closed closets, bags, and drawers, hospital rooms themselves are public areas where "doctors, nurses, and other hospital staff routinely go in and out of . . . at all hours of the day and night without regard to the patients' wishes."[24] Thus, the Michigan court affirmed the patient's murder conviction, adding that "[n]o one who had ever spent any time in a hospital room could continue to harbor any false expectations about his personal privacy or his ability to keep the world outside from coming through the door."[25]

---

[17] *Id.* at 714. *See also People v. Hillsman*, 362 Ill. App. 3d 623, 839 N.E.2d 1116, 298 Ill. Dec. 469 (2005) (finding shooting victim did not have reasonable expectation of privacy in hospital's emergency department; upholding admission of DNA evidence obtained from victim's clothing which victim had provided to police without objection).

[18] *See United States v. Howard*, 2011 U.S. Dist. LEXIS 41211 (N.D. Ga. Apr. 14, 2011) (while police officer was in emergency department interviewing witness to robbery, defendant was brought into a trauma room located in the emergency department, and witness identified defendant's voice as the robber; officer observed defendant's wound which was consistent with witness description; after hospital staff cut off defendant's bloody clothing for surgery and left clothing on the ground, officer took the clothing into evidence); *State v. Cromb*, 220 Or. App. 315, 185 P.3d 1120 (2008) (patient brought to emergency department after driving his car into a telephone pole; police officer observed patient in curtained off area of emergency department and overhead nurse's comment regarding patient; court held no expectation of privacy in a public place and that hospital staff, rather than the patient, had the right to exclude others from the emergency department).

[19] *Radcliff*, 712 N.E.2d 424.

[20] *Id.* at 432.

[21] *See Wilson*, 99 S.W.3d at 770.

[22] *State v. Stott*, 171 N.J. 343, 794 A.2d 120 (2002).

[23] *People v. Courts*, 205 Mich. App. 326, 517 N.W.2d 785, 786 (1994).

[24] *Id.*

[25] *Id.*

## Searches by A Hospital to Protect Staff and Patient Safety

Courts have found searches permissible when performed to protect the safety of staff and patients. For example, in Minnesota, the staff at a sex offender program located at a state hospital facility searched patients' rooms after learning of a pornography "lending ring" operating between its facilities. Plaintiff, patient Woodruff who had been involuntarily committed, refused to sign a consent form and left his room when staff began to search it, at which point staff informed Woodruff that his room would be locked until a meeting was held to determine next steps. In response, Woodruff signed the consent but also wrote that it was "signed under duress." His room was searched, and items were confiscated. The court found it was reasonable for the staff to assume the presence of sexually explicit material posed a security risk and that a search for such materials was necessary.[26] The court noted that Woodruff had been provided opportunities to be present during the search and also later request a hearing, but he had declined both.[27]

As another example, patients at a Veteran's Administration hospital in New Jersey contended they were subjected to unreasonable searches of property.[28] The court held that searches of patients' clothing and belongings at admission, in order to detect potential weapons, drugs, liquor or other impermissible property, was reasonable and served the hospital's significant goals of protecting patients and others at the hospital. The court also held the search of patient lockers must be reasonable, with reasonableness being a balance between the need to search against the invasion involved in the search. Moreover, the court noted that searches were permissible

if conducted on the belief that one or more hospital patients possessed contraband, such as a dangerous weapon, drugs or liquor, which could impair patients, interfere with their treatment or create a dangerous situation at the hospital.[29]

## Types of Searches at Hospitals

To the extent a search conducted by a hospital's staff and employees is conducted pursuant to a written hospital policy and is consistent with inventory purposes or exigent circumstances, the more likely a court will find the search was reasonable.

### (a) Inventory Searches

A hospital's routine, inventory search of a patient at the time of admission is often considered reasonable, especially if the search is conducted pursuant to hospital policy and for purposes other than to discover contraband, such as to protect the patient's property, to protect the hospital from claims of property loss or theft, or to identify a patient and his medical history.[30]

To fit within this exception, the purpose of the hospital's inventory search must not be intended to discover contraband or to obtain evidence to use against the patient in a criminal action. Instead, an inventory search is likely reasonable if it is performed:

- in an effort to determine, especially in an emergency setting, if the patient possessed information relevant to the patient's appropriate and necessary care;

- to protect the patient's property while hospitalized;

- to protect the hospital from claims or disputes over lost or stolen property; or

- to protect staff and other patients from potential dangers.

Courts have upheld inventory searches of hospital patients for purposes of patient identification, care

---

[26] See Woodruff v. Rosburg, 2001 Minn. App. LEXIS 1060 (Sept. 18, 2001) (unpublished opinion).

[27] Id. For other cases involving general searches of an involuntarily committed person's body, room and belongings, see Kansas v. Hendricks, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (civil commitment under state's sexually violent predator law); Lombardo v. Holanchock, 2008 U.S. Dist. LEXIS 48753 (S.D.N.Y. June 25, 2008) (commitment to state psychiatric hospital after pleading insanity in criminal case); Serna v. Goodno, 567 F.3d 944 (8th Cir. 2009) (civil commitment under state sex offender program); Semler v. Ludeman, 2010 U.S. Dist. LEXIS 1571 (D. Minn. Jan. 8, 2010) (same); Hazeltine v. Montoya, 2012 U.S. Dist. LEXIS 30194 (E.D. Cal. Mar. 6, 2012) (patient civilly committed to state hospital for treatment under state's sexually violent predator act); Bailey v. Howard, ___ Kan. App. 2d ___, 272 P.3d 1287 (2012) (same).

[28] Falter v. Veterans Admin., 632 F. Supp. 196 (D.N.J. 1986).

---

[29] Id.

[30] Wilson, 99 S.W.3d 767. This inventory exception arises from prior case law permitting inventory searches by police of automobiles. See Vargas v. State of Texas, 542 S.W.2d 151 (Tex. Crim. App. 1976) (nurse's search of hospital patient) (referring to South Dakota v. Opperman, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976)).

and treatment, ascertaining medical history, and determining current medications.[31] In Texas, for example, a hospital staff member's search of an emergency patient's purse and backpack was held reasonable because the hospital's policy required items valued at over $100 to be sent to security for inventory and safekeeping.[32] The Texas court also noted the drugs and gun found could have directly caused a threat to hospital staff and other patients. Likewise, in another case in Texas, a nurse conducted an inventory search of a semiconscious patient's clothing and personal effects while in the emergency department. The court held that the gun discovered in the patient's pocket constituted admissible evidence, emphasizing that the purpose of the hospital's search was not to discover contraband or to obtain evidence to be used against the patient criminally. Instead, the search was conducted pursuant to hospital policy in order to prepare the patient for examination, protect the patient's property and protect the hospital.[33]

### (b) Searches under "Exigent Circumstances"

Exigent circumstances include "situations presenting an immediate danger to life or of serious injury or an immediate threatened removal or destruction of evidence."[34] Another court has defined exigent circumstances as "preclud[ing] expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both."[35] Although the phrase "exigent circumstances" cannot be precisely defined, "it may be said to exist when the demands of the occasion reasonably call for an immediate police response."[36] An individual's belief that exigent circumstances exist, however, "must be based on more than mere speculation."[37]

Courts look to many factors to determine whether exigent circumstances exist, including:

- the reasonable belief that the evidence was about to be lost, destroyed, or removed;

- the seriousness of the offense involved;

- the possibility that the suspect is armed and dangerous; and

- the strength or weakness of the underlying determination of probable cause.[38]

In California, police were called to the scene of a shooting and brought the victim to a hospital emergency department.[39] Pursuant to police procedure, the police collected from hospital staff a bag of the victim's personal clothing for evidence. While looking through and inventorying the victim's clothing, the police found methamphetamine, and the victim was charged and later convicted of possessing illegal drugs. On appeal, the victim (now defendant) challenged admission of the drugs as evidence and the prosecutor claimed exigent circumstances applied. The appellate court disagreed and held the record developed thus far did not show exigent circumstances, reversing the trial court's admission of the evidence and the conviction.[40] Similarly, in New Jersey, a court held exigent circumstances did not exist to permit the police to conduct a warrantless search of a patient's room at

---

[31] *See e.g., Radcliff,* 712 N.E.2d 424 (inventory search of badly injured person in medical emergency to determine her identity and possible medications held reasonable; drugs inadvertently found by nurse during search were turned over to the police); *State v. Gans,* 454 So. 2d 655 (Fla. Dist. Ct. App. 1984) (search of semiconscious patient in emergency department held reasonable where search by hospital employee, pursuant to her duties, attempted to identify patient and any medical history; vial of white powder was found and reported to police). *See also Crawford v. State of Texas,* 292 S.W.2d 123 (Tex. Crim. App. 1956) (inventory of hospital patient's clothing necessary for purposes of identification, care and treatment, and safekeeping of patient's belongings; here, the clothing was inventoried by police at the physician's direction for purposes of medical care, while physician was examining the patient nearby).

[32] *Wilson,* 99 S.W.3d 767.

[33] *Vargas,* 542 S.W.2d 151. After the nurse discovered the gun, she notified the hospital's security guard, who then notified the police. The police then continued the inventory search for the protection and safety of the hospital's personnel and other patients. The *Vargas* court held the continued search by the police, including of the defendant's clothing and wallet, was also reasonable. *Id.* at 155. *See also United States v. Clay,* 2006 U.S. Dist. LEXIS 58061 (E.D. Ky. Aug. 17, 2006) (finding inventory search of defendant's coat by university hospital nurse was not subject to Fourth Amendment; although nurse was state hospital employee, she inadvertently discovered defendant's illegal drugs while removing items from his coat for inventory as required by hospital policy, and she did not act at request of or in concert with law enforcement).

[34] *State v. Clark,* 65 Haw. 488, 654 P.2d 355, 360 (1982).

[35] *Stott,* 794 A.2d at 129 (citation omitted).

[36] *Clark,* 654 P.2d at 360.

[37] *Stott,* 794 A.2d at 129.

[38] *Id.*

[39] *People v. Costa,* 2004 Cal. App. Unpub. LEXIS 7539 (Aug. 13, 2004).

[40] *Id.*

a state psychiatric hospital, noting the room had been locked, police could have been posted outside the room while a warrant was obtained, and no one's safety was in jeopardy.[41]

However, in *People v. Spencer*, a California case, exigent circumstances were found.[42] In that case, the defendant was involuntarily detained for further mental evaluation and had been placed in the psychiatric unit of a general hospital. Per hospital policy, hospital staff took his personal belongings and stored them in a locked room. After check-in, the defendant asked to see his briefcase. A nurse gave the defendant his briefcase and then followed him to his room. The defendant attempted to open the case without the nurse seeing but then said he changed his mind and handed the briefcase back to the nurse. Later in the day, a psychologist contacted the nurse and said he believed the defendant had brought a gun into the hospital. Suspecting the gun was in the briefcase, the nurse went to the storage room, opened the briefcase and found the gun. The defendant saw this happening and attempted to enter the storage room to grab his briefcase. Staff restrained the defendant, the nurse seized the briefcase, and the hospital's police officer was called. That officer opened the briefcase, found the gun inside, and contacted the sheriff's office who took custody of the briefcase. While the defendant claimed this was an illegal search and seizure, the court held the exigent circumstances exception applied; based on the facts involved, the nurse reasonably believed patient and staff safety was in imminent danger.[43]

What is considered "exigent circumstances" by hospital staff could vary from case to case, depending upon many factors, including the staff's reasonable belief and the facts supporting such belief, the possibility of a dangerous item, the destruction or loss of the item due to passage of time (including a substance which would be absorbed or dissolved), and the possibility of injury to the patient, staff or other patients. If it is possible for hospital staff to secure the room or observe the patient until law enforcement arrives, without danger or injury to others and without the item being destroyed or lost, a court may find exigent circumstances did not exist.

Unfortunately, whether exigent circumstances are present at the time of the search is decided on a hindsight basis by the court. Accordingly, good chart documentation is crucial, particularly as to the facts known and the hospital's reasonable belief at the time of the search.

### (c) Plain View

While the plain view doctrine applies to police searches rather than private searches, two recent cases are worthy of mention.

First, in *United States v. Howard*,[44] a police officer was in a Georgia hospital's emergency department interviewing a security guard who had witnessed and been shot during a robbery. The guard told the police officer that he had shot the attempted robber in the chest. Before the interview concluded, the defendant was brought into the same emergency department with a gunshot wound to the chest and placed near the security guard in a curtained area. The guard overheard the defendant and identified that voice as the voice of the robber. The officer observed the defendant had a gunshot wound to the chest, that hospital staff had cut off defendant's bloody clothing, and that the staff had left the clothing on the ground. After the defendant was taken to surgery, the officer took the defendant's clothing into evidence. Upon the defendant's challenge to the evidence, the court held the officer was legally in the emergency department, the clothing was in plain view, and it was immediately apparent to the officer that the nature of the clothing was incriminating. Accordingly, the search of the area and seizure of the clothing were permitted under the plain view doctrine.

Second, in *People v. Hillsman*,[45] the patient was being treated in the emergency department of an Illinois hospital due to a gunshot wound. As part of investigating the shooting, police officers came to the hospital and spoke with the patient in the emergency department. He told the officers what he was wearing and where they could find his clothing in his treatment room (which was in the emergency department). The officers took the clothing with them without objection by the patient. The patient's clothing was later tested for DNA and matched a victim's DNA

---

[41] *Stott*, 794 A.2d 120.

[42] *People v. Spencer*, 2004 Cal. App. Unpub. LEXIS 11143 (Dec. 9, 2004) (unpublished/noncitable). *review denied* (Mar. 16, 2005).

[43] *Id.*

[44] *United States v. Howard*, 2011 U.S. Dist. LEXIS 41211 (N.D. Ga. Apr. 14, 2011).

[45] *Hillsman*, 839 N.E.2d 1116.

from a murder committed earlier in the night. Although the patient (now defendant) moved to exclude the DNA evidence, the evidence's admission was upheld under the plain view doctrine. The court found that the officers had a legitimate reason for being in the emergency department, the object was in plain view there, and it was immediately apparent to the officer that the victim's clothing was evidence of the shooting. Therefore, the officers were justified under the plain view doctrine in seizing the clothing.

### Additional Considerations for Hospitals Conducting Searches

A hospital should have a written search policy which provides guidelines for deciding whether and how a search of a patient's body, room or belongings should be performed. The policy should be written broadly enough to incorporate a range of possible scenarios in which there is a reasonable basis for a search. Additionally, the policy should be consistent with applicable accreditation standards. For example, accreditation standards from The Joint Commission require a hospital to have a written plan to minimize risks in the environment of care, including a written plan for managing security of persons who enter the hospital's facilities.[46]

A hospital's search policy also should be consistent with applicable state laws. State statutes and regulations may address searches conducted at healthcare facilities, especially facilities serving mental health, substance abuse or developmentally disabled patients. Such laws often recognize specific patient rights and set forth criteria for searches of patients and/or their rooms. In Georgia, for example, a search of a patient's personal effects at a mental health or substance abuse facility may be conducted after admission only with the patient's consent unless other criteria are met (e.g., chief medical officer has reasonable cause to believe the patient has an item that may be dangerous or illegal).[47] Such a facility-specific statute or regulation may also set forth chart documentation requirements and specify whether the

patient has the right to be present during the search.[48] Even if a general, acute-care hospital is not governed by these laws, some of the criteria for searching these patient populations may be insightful and worthy of possible consideration in a general hospital's policy.

In the event of a patient complaint to a State agency or The Joint Commission, the hospital's written policy, chart documentation, regulatory requirements, and accreditation standards typically serve as the measuring sticks by which the hospital's actions are reviewed.[49] If the hospital's written policy was followed and if the search was performed based on a justifiable (and documented) reason, the more likely a search will be considered reasonable.

Keep in mind that even if a State surveyor or The Joint Commission finds the search was appropriate, the patient who was searched (or the patient's family) could file a lawsuit against the hospital. At the other end of the spectrum, at least two recent cases have involved a hospital's potential civil liability for *not conducting* a search. Both cases involved patient deaths, and in both cases the trial courts ruled the suits involved only ordinary negligence and thus expert testimony was not necessary.[50]

[46] *See* The Joint Commission, EC.01.01.01 and related Elements of Performance. Comprehensive Accreditation Manual for Hospitals (2011). *See also* EC.04.01.01 and related Elements of Performance (hospital monitors and investigates security incidents involving staff, patients or others at the facility).

[47] *See e.g.*, Ga. Comp. R. & Regs. 290-4-6-.03(3)(f).

[48] *See e.g., id.* (with some exceptions, patient has right to be present at the search and to be informed of the reasons for the search; also, patient's chart must contain documentation of reasons for the search as well as the date, time and results of the search).

[49] *See e.g.*, "Preventing Violence in the Health Care Setting," Sentinel Event Alert, Issue 45, June 3, 2010. http://www.jointcommission.org/assets/1/18/SEA_45.pdf. (noting The Joint Commission Environment of Care standards for providing security of patients, staff and visitors).

[50] *See Coleman v. Wiencek*, 2010 U.S. Dist. LEXIS 26684 (N.D. Ill. Mar. 22, 2010) (patient in emergency department of a private hospital was evaluated and recommended for placement in the psychiatric ward; patient's family sued hospital for wrongful death after patient, who had a gun, was shot by police after a standoff at the hospital; patient's family claimed the hospital breached its duty of care by failing to search the patient); *Snyder v. Injured Patients & Families Comp. Fund*, 2009 WI App 86, 320 Wis. 2d 259, 768 N.W.2d 271 (patient in private hospital's behavioral health unit was released on a five-hour pass but was not searched upon her return to the hospital despite hospital policy; three days after returning to the hospital, patient shot herself with a gun she had brought back to the hospital; patient's husband sued the hospital for wrongful death and successfully contended the failure to conduct adequate searches constituted ordinary negligence). *See also Heastie v. Roberts*, 226 Ill. 2d 515, 877 N.E.2d 1064, 315 Ill. Dec. 735 (2007) (patient brought suit against hospital for injuries he sustained in a fire while restrained, claiming hospital staff should have searched him for contraband per hospital policy before restraining him in room where fire later started; court remanded case for new trial because the patient's "failure to search claim" did not require expert medical testimony).

### Conclusion

A hospital can conduct reasonable searches of a patient, his room and his belongings. While what constitutes "reasonable" depends on the circumstances of each situation, a few general themes can be gleaned from the cases.

First, a court weighs the reasonableness of a hospital's searches by looking to numerous factors, including 1) whether the patient had a reasonable expectation of privacy in the setting involved; 2) the purpose of the hospital's search; 3) whether the search was conducted pursuant to written hospital policy; 4) whether the hospital's discovery of contraband was inadvertent; and 5) whether exigent circumstances existed. Second, courts recognize that hospital staff members have a legitimate need to search patients, especially in the emergency department, to learn the identity, medical history and medications of patients, particularly those unable to communicate with medical personnel. Third, the more extended a patient's hospital stay is, the more likely a court could find the patient enjoyed a reasonable expectation of privacy, e.g., a two-week stay in a residential-type facility versus a four-hour stay in the emergency department. Fourth, as the purpose of a hospital's search leans more toward the discovery of suspected contraband, a court is more likely to find an inventory exception does not apply. In that instance, perhaps another justification applies, such as exigent circumstances.

In assessing whether exigent circumstances existed, a court will likely look to the nature of the suspected item and whether it would be destroyed or absorbed by the passage of time. In particular, a court looks to whether the patient, his room or other area could have been secured or sufficiently observed while the hospital contacted police or while the police obtained a warrant. A court also often assesses whether the hospital can articulate specific facts underpinning a reasonable belief of exigency rather than general concerns or mere rumors.

Overall, a well-drafted hospital policy, good documentation, and training are crucial in later showing a hospital's search of a patient, his room or belongings was reasonable. The policy should be broadly worded and consistent with applicable state law and accreditation standards. Chart documentation should include a summary of the reasons for a search, who was present, what was searched, and the results of the search. As a hospital develops or updates its search policy, education and training should be provided so that hospital staff, administration and hospital security are aware of the policy and the different types of permitted searches.



Julie Dawn Tapia
720 Avenue F
Birmingham, Alabama
35214

SECURITY
JAN 17 2023
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

U.S. POSTAGE PAID
FCM LG ENV
BIRMINGHAM, AL
35218
JAN 13, 23
AMOUNT
$2.88
R2305E123925-50

RDC 28    35203

US District Court Clerk
1729 5th Avenue north
Suite # 140
Birmingham, Alabama
35203